1  BRIAN T. CORRIGAN, ESQ. (BAR NO. 143188)
2  EMAIL: BCORRIGAN@CORMORLLP.COM
   STANLEY C. MORRIS, ESQ. (BAR NO. 183620)
3  EMAIL: SCM@CORMORLLP.COM
4  **CORRIGAN & MORRIS LLP**
   12300 WILSHIRE BOULEVARD, SUITE 210
5  WEST LOS ANGELES, CALIFORNIA 90025
6  TELEPHONE: (310) 394-2800
   FACSIMILE: (310) 394-2825
7       *Attorneys for* Plaintiff, MAX LIGHTFOOT

8
        **UNITED STATES DISTRICT COURT**
9       **NORTHERN DISTRICT OF CALIFORNIA**

10
   MAX LIGHTFOOT,                     Case No.:
11                                    **COMPLAINT FOR MONEY DAMAGES**
                      Plaintiff,       **AND EQUITABLE RELIEF BASED ON:**
12        v.                            1.  **ELDER ABUSE;**
13                                      2.  **SECURITIES FRAUD, SECTION**
   MONEYONMOBILE, INC., A                  **10(b), SECURITIES EXCHANGE**
14 Texas Corporation, HAROLD              **ACT OF 1934 AND SEC RULE 10b-5;**
   MONTGOMERY, DAVID B.
15 UTTERBACK; JAMES M.                  3.  **SECTION 12(2) OF SECURITIES**
   MCKELVEY; AND SCOTT S.                  **ACT OF 1933;**
16 AREY,                               4.  **SECTION 18(a) OF THE**
17                                         **SECURITIES EXCHANGE ACT**
                      Defendants.          **OF 1934;**
18                                      5.  **SECTION 20(a) OF THE**
19                                         **SECURITIES EXCHANGE ACT**
                                           **OF 1934;**
20                                      6.  **FRAUD AND DECEIT;**
21                                      7.  **NEGLIGENT**
22                                         **MISREPRESENTATION;**
23                                      8.  **BREACH OF FIDUCIARY DUTIES;**
                                           **AND**
24                                      9.  **BREACH OF CONTRACT**
25                                    **JURY DEMANDED**
26
27
28

---

*COMPLAINT*

1

Plaintiff, Max Lightfoot ("Plaintiff" or "Lightfoot"), for his Complaint herein against Defendants, Harold Montgomery, David B. Utterback, James M. McKelvey, Scott S. Arey, and MoneyonMobile, Inc. ("MOMT" and collectively with all of the foregoing named defendants, the "Defendants"), respectfully alleges:

## NATURE OF ACTION

1.      At all relevant times, Ankit Sahu, a California resident, has been an investment advisor for the Plaintiff, Lightfoot.  Before June 1, 2017, Mr. Sahu, while associated with UBS, worked as Mr. Lightfoot's investment advisor, and continued to act as such for Mr. Lightfoot throughout Mr. Lightfoot's investment in MOMT. Mr. Lightfoot, at all relevant times, kept his life's savings at UBS, until he invested in MOMT. Mr. Sahu left his job at UBS and went to work for MOMT, where Mr. Sahu's principal responsibility was to raise capital for MOMT. Mr. Sahu and all Defendants herein persuaded Plaintiff to invest in MOMT, as alleged in greater detail below.

2.      Between June 1, 2017 and August 3, 2018, Max Lightfoot, a 75-year old man with limited mobility and even more limited investment sophistication, reasonably relied on Mr. Sahu to interpret the disclosures made by the Defendants regarding their financial condition, and to provide him investment advice based on such disclosures. Plaintiff is informed and believes that Mr. Sahu's investment advice provided to Mr. Lightfoot recommending that he make a $700,000 investment in MOMT and the subsequent conversion decisions were made based on Mr. Sahu's and, indirectly, Mr. Lightfoot's, reasonable reliance on the Defendants, officers and directors of MOMT, and their certified, audited and unaudited financial disclosures filed with the Securities Exchange Commission and otherwise publicly available.

3.      Mr. Lightfoot, directly and indirectly through Mr. Sahu, acting as both Mr. Lightfoot's financial advisor and as an employee and agent of MOMT, was solicited by Defendants, HAROLD MONTGOMERY, DAVID B. UTTERBACK, JAMES M. MCKELVEY, SCOTT S. AREY, and MOMT, through Defendants' false and misleading representations and omissions of material fact made to both Mr. Sahu and Mr. Lightfoot, to loan MOMT $700,000, a full third of Mr. Lightfoot's net worth. The loan was never repaid. Instead, the same Defendants fraudulently persuaded Mr. Lightfoot and his financial advisor, Mr. Sahu, that it would be in Mr. Lightfoot's best interest to convert all of his MOMT debt into MOMT preferred stock, and then all of his MOMT preferred stock into MOMT common stock.

4.      After convincing Mr. Lightfoot, directly and indirectly through Mr. Sahu, that it was in Mr. Lightfoot's best interests to convert his MOMT debt into MOMT preferred stock and then MOMT common stock, the lowest level of equity, Defendants came clean with a disclosure. On September 14, 2018, MOMT disclosed that its purported operating entity, upon whose operations MOMT was fully dependent, was not in fact owned by MOMT, as represented in its public filings, but that, instead, a group of affiliates in India had hijacked the company, hired all of its employees, and effectively discontinued MOMT's operations and viability, a risk not remotely disclosed to Max Lightfoot by the Defendants in their public filings or otherwise, prior to the securities transactions alleged herein.

5.      Upon disclosure of such facts, MOMT's auditors resigned, citing fraud, its Board of Directors, except Harold Montgomery, resigned, MOMT's stock stopped trading, and Mr. Lightfoot's investment lost all of its value.  As a direct and proximate result of the wrongdoing described herein by the

Defendants, Plaintiff, Mr. Lightfoot, lost his entire value of his $700,000 investment.

## THE PARTIES

6.     Plaintiff, Max Lightfoot, is a 75 year old man and resident of San Francisco, California.

7.     Plaintiff is informed and believes and based thereon alleges that defendant, MoneyonMobile, Inc., is a Texas corporation whose principal offices are located at 500 North Akard Street, Suite 2850, Dallas, Texas.

8.     Plaintiff is informed and believes and based thereon alleges that Defendant, Harold Montgomery, is a citizen of Texas, and, at all relevant times, was and remains the Chief Executive Officer, Secretary and Chairman of the Board of Directors of Defendant, MoneyonMobile, Inc.

9.     Plaintiff is informed and believes and based thereon alleges that Defendant, David B. Utterback, is a citizen of Texas, and, at all relevant times, was a member of the Board of Directors of Defendant, MoneyonMobile, Inc.

10.     Plaintiff is informed and believes and based thereon alleges that Defendant, James M. McKelvey, is a citizen of Texas, and, at all relevant times, was a member of the Board of Directors of Defendant, MoneyonMobile, Inc.

11.     Plaintiff is informed and believes and based thereon alleges that Defendant, Scott S. Arey, is a citizen of Texas, and, at all relevant times, was the Chief Financial Officer of Defendant, MoneyonMobile, Inc.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) in that the action is between citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs. Separately, this Court has jurisdiction over this action under 28 U.S.C. §1331 in that the action arises under the laws of the United States – specifically,

the federal securities laws cited herein.  MOMT is a company that, at all relevant times, was organized and located in the State of Texas, and incurred irrevocable liability to Plaintiff to issue and deliver the securities sold to Plaintiff, as alleged in more detail herein, within the borders of the United States.

13.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)(1) and (2), in that it is a judicial district in which the Plaintiff, an elderly man medically unable to travel, resides, and in which a substantial part of the events or omissions giving rise to the claims occurred.

## COMMON ALLEGATIONS

14.    Between June 1, 2017 and August 3, 2017, MOMT representatives, including Ankit Sahu and Harold Montgomery, solicited Mr. Lightfoot, a 75-year old man, to invest $700,000, one-third of his entire net worth, based on the terms of three short-term (1-year) promissory notes issued to Mr. Lightfoot by MOMT.

15.    At all relevant times, Mr. Lightfoot had a close fiduciary relationship with Mr. Sahu, as his long-time investment advisor, formerly with UBS, and, at the time, working to raise capital for MOMT as its employee. Mr. Lightfoot was and remains a physically impaired elderly and financially unsophisticated person. Mr. Lightfoot was duped into making unsuitable investment decisions through false and misleading representations and disclosures which omitted material facts necessary to make them not misleading, resulting in such $700,000 investment in MOMT. Plaintiff is informed and believes that Mr. Sahu, too, was duped by such false statements and omissions, and, as a result, passed much of such information unwittingly along to Mr. Lightfoot on behalf of Mr. Sahu's employer, MOMT and boss, Harold Montgomery.

16.     In the first set of wrongful securities transactions, MOMT sold Mr. Lightfoot short-term promissory notes issued by MOMT based on MOMT's and Mr. Montgomery's assurance that Mr. Lightfoot's loans would be repaid much sooner than the one-year maturity dates, because each loan was intended only to cover a short-term gap in financing while a new private placement closed. Mr. Montgomery represented to Mr. Lightfoot that the funding would close within three months. Mr. Lightfoot was told and reassured by Mr. Montgomery that the proceeds of such financing would be used to pay off Mr. Lightfoot's loans well in advance of their maturity dates. MOMT representatives, through MOMT's public filings, including all filings with the Securities and Exchange Commission preceding the investment transactions alleged herein, and verbal representations made to Mr. Lightfoot by Mr. Montgomery and Ankit Sahu, failed to disclose any risk that the private placement would not be completed timely. Further, MOMT representatives, including those referenced herein, did not disclose that MOMT might choose not to use such funds to repay Mr. Lightfoot. Finally, MOMT representatives, including those referenced herein, failed to disclose that MOMT did not protect its ownership in its operating company and might lose its entire operations through corporate restructuring by third parties that could occur in India. All such disclosures were necessary to make the representations to Mr. Lightfoot made in MOMT's public filings, as well as verbal and written representations made to Mr. Lightfoot by Mr. Montgomery and Mr. Sahu, on behalf of MOMT, not misleading.

17.     Unfortunately, Max Lightfoot's loans to MOMT were never repaid. In January 2018, $12.5 million of the financing was completed and available to MOMT.  But, Mr. Lightfoot was not repaid as promised. Instead of paying Mr. Lightfoot, MOMT and Mr. Montgomery compounded their initial wrongful acts,

by inducing Mr. Lightfoot into a second and third fraudulent securities transaction:

    a.  in February 2018. through fraud, deception and omission of material facts, MOMT and Mr. Montgomery persuaded Mr. Lightfoot to convert his debt into Preferred Shares based on false representations that the Preferred Shares would bear a 12% per year return paid monthly (which payments were never made and, when the Preferred Share certificates were issued, did not reference such 12% dividend payout) and, at the time of such conversion, continued to omit the disclosures, alleged below, necessary to render its representations in its public filings not misleading; and

    b.  on or around May 11, 2018, through fraud, deception and omission of material facts, MOMT and Mr. Montgomery persuaded Mr. Lightfoot to convert such Preferred Shares into common stock, based on the false representations that the conversion would generate free trading common stock (which was never issued to Mr. Lightfoot) and promises that the 12% dividend would be compensated, instead, by a consulting agreement, pursuant to which compensation of the same amount would be paid for no actual services. At the time of such conversion, the Defendants continued to omit the disclosures necessary to render its representations in its public filings not misleading.

18.    At all relevant times, MOMT and each of the Defendants omitted disclosures that would be necessary to make representations in public filings and

1  made directly to Mr. Lightfoot by MOMT and its representatives not

2  misleading, including each of the following:

     a.  that, despite Mr. Montgomery's and Mr. Sahu's representations

         that the private placement would close and the funds therefrom

         used to repay the debt, there was a material risk that such

         financing and repayment would not occur within such three-

         month period;

     b.  that there was a substantial risk that MOMT would decide not to

         use funds generated from the private placement to repay Mr.

         Lightfoot;

     c.  that there was a substantial risk that adverse third parties in India

         could cause MOMT the total loss of its operation and financing

         prospects, without compensation, leaving MOMT unable and

         unwilling to repay Mr. Lightfoot's notes; and

     d.  that MOMT's management had made misrepresentations to its

         auditors regarding its India operating company ownership and

         assets, among other things, and that, upon discovery of such

         misrepresentations, there was a substantial risk that its auditors

         would resign and make public disclosure of the fraudulent

         representations upon which its resignation was based, the

         consequences of which would render the repayment of Mr.

         Lightfoot's investment less likely or impossible, and the

         liquidation of common stock in MOMT delayed, or possibly

         permanently impaired, and thus far less valuable, if not entirely

         worthless.

     e.  That Mr. Sahu, an employee of MOMT while acting as Mr.

         Lightfoot's financial advisor, had a conflict of interest in that

Mr. Sahu (as an employee of MOMT responsible for raising

capital for the company) was incentivized by MOMT to sell Mr.

Lightfoot on the investment in MOMT, including through salary

and stock options in MOMT, made more valuable and liquid

based on Mr. Lightfoot's $700,000 investment in MOMT.

Collectively, the foregoing omissions shall be referred to herein as the

"Omissions".

19.    Defendants, and each of them, made, approved and certified in

public filings, as alleged herein, misrepresentations made to the public,

including Mr. Lightfoot, and his financial advisor (and MOMT employee), Mr.

Sahu.  Specifically, the Defendants, and each of them, misrepresented that

MOMT held  majority share ownership rights in its purported operating

subsidiary. MOMT's SEC Form 10-K for the fiscal years ended March 31, 2016

and March 15, 2017, approved by the Defendants, state, without adequate risk

disclosures, that:

"On March 31, 2015, My Mobile Payments Limited executed a

business transfer agreement to sell its business to DPPL. As of

March 31, 2016, the Company has acquired 68.6% and 8.17% of

the outstanding common stock of DPPL and MMPL, respectively.

The Company and MMPL have entered into an agreement by

which the Company intends to acquire additional shares of common

stock of MMPL to increase its equity percentage to 74% for an

additional investment amount to be negotiated as future

investments are made.  The acquisition of additional shares is

subject to approval by the Indian government and regulations for

foreign investment."

*Id*. at p. 6. A substantially identical disclosure was published at page 2 of MOMT's SEC Form S-1 filing on March 26, 2018, and May 16, 2018 Prospectus. The risk that MOMT's purported ownership in such subsidiaries could be taken over by third parties in India without compensation is a material fact necessary to make such representation not misleading.

20.     Plaintiff is informed and believes and based thereon alleges that the purported March 31, 2015 business transfer agreement on which DPPL, the operating arm of MOMT, purportedly acquired the business of MMPL, upon which DPPL relied for its operations, was never fully documented and consummated. MOMT not only failed to consummate the transaction, but also failed to disclose such failure to public investors, including Mr. Lightfoot. Instead, MOMT and its officers and directors maintained the representation that the business transfer agreement was "executed" in each of the foregoing public filings, falsely implying that the business transfer agreement "executed" March 31, 2015 had been fully consummated within a reasonable time after execution. The fact that the business transfer, in truth, was never fully consummated by way of thorough documentation of such transfer, and prohibition of competition in agreements with its founders, are material facts and risks that were required to be disclosed to investors in order to make that sentence not misleading. Those facts were, instead, concealed from Mr. Lightfoot and the public.

21.     Additional misrepresentations and omissions were made to induce Mr. Lightfoot into making each of his two conversions (a) from notes to Preferred Stock in February 2018; and (b) from Preferred Stock to Common Stock on May 11, 2018.

22.     To induce the first conversion, Mr. Montgomery and MOMT promised that Mr. Lightfoot would profit from the conversion because his 10% yielding notes would be replaced by 12% yielding Preferred Stock. After the

conversion, MOMT stopped making the interest payments previously made by MOMT on the promissory notes, yet failed to start making the 12% dividend payments promised on the Preferred Stock. Contrary to the representations made to Mr. Lightfoot to persuade him to convert his debt to Preferred Stock, MOMT did not make Preferred Stock dividend payments at all.  When Mr. Lightfoot complained about not receiving his Preferred Stock dividends, MOMT explained that for their own accounting purposes, it could not issue the Preferred Stock in a form to yield a 12% dividend, because doing so would require the Preferred Stock to be treated as debt (which they did not want to do).

23.    Instead, MOMT and Mr. Montgomery promised that MOMT would pay Mr. Lightfoot a consulting fee to make up for the 12 percent yield promised, together with common stock that could be sold freely into the public market. MOMT and Mr. Montgomery failed to disclose that such transaction, itself, would constitute an improper and fraudulent accounting of what was, in essence, an interest payment on a debt or dividend payment on stock.

24.    Collectively, all of the foregoing misrepresentations shall be referred to collectively herein as the "Misrepresentations".

25.    Mr. Lightfoot, an unsophisticated elderly gentleman, reasonably believed MOMT's and Mr. Montgomery's deceptive misrepresentations and false promises, and, in reliance thereon, converted his promissory notes into Preferred Stock.

26.    When Mr. Lightfoot complained about the breach of Mr. Montgomery's and MOMT's promise to make 12% Preferred Stock Dividend payments, Mr. Montgomery and MOMT proposed a second solution. They offered to convert the Preferred Stock into free trading MOMT common stock, based on assurances that Mr. Lightfoot could immediately sell that stock into the public market to recoup his investment.  In addition, Mr. Montgomery and

MOMT offered Mr. Lightfoot, instead of paying 12% dividends, that MOMT would compensate Mr. Lightfoot pursuant to the terms of a consulting agreement, at the same rate, but for no actual consulting services.  Mr. Lightfoot reasonably relied on Mr. Montgomery's and MOMT's promises, after consulting with his investment advisor, Mr. Sahu, and accepted the proposal on or around May 11, 2018.

27.     Again, these representations proved to be false, and these promises were immediately breached.

28.     MOMT paid March, April, May and June 2018 payments purportedly under a consulting agreement, which was never presented in writing to Mr. Lightfoot.

29.     MOMT failed to issue to Mr. Lightfoot any common stock.  Mr. Lightfoot made immediate demand for the free trading common stock he was promised based on his May 11, 2018 conversion. MOMT and its counsel stalled such delivery.  Then, on June 4, 2018, less than a month after promising such free trading shares, MOMT went delinquent on its public filings, defeating the exemption from the Section 5 registration requirement pursuant to Rule 144 necessary for Mr. Lightfoot to sell his common stock into the public market. Because Rule 144 expressly requires current reporting, and no  lawyer's opinion letter could be secured by Mr. Lightfoot so long as MOMT's reporting was not current, MOMT and Mr. Montgomery knew or should have known on May 11, 2018, when the conversion to common stock was sold to Mr. Lightfoot, that Mr. Lightfoot would not be receiving free trading stock immediately, as promised. Knowing that they would not be able to keep their promise to deliver to Mr. Lightfoot common stock without legend, MOMT and Mr. Montgomery fraudulently promised Mr. Lightfoot that it would issue such shares and that he could then, immediately, liquidate such shares into the market to recover his

1   investment. Only after Mr. Lightfoot was duped into converting his debt into

2   Preferred Stock, and then converting his Preferred Stock into common stock did

3   MOMT and Mr. Montgomery disclose to Mr. Lightfoot that he would not be

4   receiving what he bargained for in agreeing to make each conversion.  To date,

5   MOMT has not cured its filing default and, it appears, is unable to do so in the

6   near term, due to the resignation of its auditors for reasons implying fraudulent

7   misrepresentations by management to its auditors pertaining to the company's

8   ownership rights of its purported operating company in India.

9       30.    The final blow came on September 14, 2018, when MOMT issued a

10   press release disclosing to Mr. Lightfoot and the public, for the first time, among

11   other things:

12       On August 22, the Company issued an 8K Statement documenting

13       that, during the month of August, its Indian operations had been

14       hijacked through illegal means. Specifically, the Board of My

15       Mobile Payments, Ltd. (known as "MMPL" - the entity holding the

16       license with the Reserve Bank of India enabling the company to

17       handle domestic remittances) held a Board meeting without our

18       knowledge or participation and installed three new Board members

19       from a group who formed themselves as "LI Digital Payments

20       Private Limited"(known as LexInnova-DPPL or LI-DPPL) and

21       approved the transfer of 50.5% of the shares of MMPL to the LI-

22       DPPL entity….

23

24       Please note that, by virtue of our various shareholder and

25       investment agreements, MOMT has a Right of First Refusal on any

26       transfers to third parties. Further, election of new Board members

27       requires our approval, and a Board meeting in which MOMT

28

1    representatives are not present is a violation of the corporate

2    governance as defined by our properly filed agreements and hence

3    a violation of Indian law (See Exhibit #3 below). The validity of

4    these agreements has been affirmed many times over the last 6

5    years with the participants.

6

7    The LI-DPPL group then proceeded to demand that all our

8    employees working at the sister company DPPL, resign and transfer

9    to the newly created company LI-DPPL. The employees did so. LI-

10   DPPL had no legal standing to make such a demand. We believe,

11   based on reports we received from employees, that they were

12   coerced into this action.

13

14   As stated earlier, the hijacking appears to be the product of many

15   months of conspiratorial planning by members of the senior

16   management of the Company's India subsidiary, (hereafter "local

17   management") with whom we have worked for the last 6 years, and

18   the third-party investment group operating under the name

19   LexInnova DPPL (LI-DPPL). (See Exhibit #1 for the incorporation

20   record of LI-DPPL. Note the incorporation date of February 28,

21   2018, indicating the earliest documented actions related to this

22   conspiracy that we have.)

23      31.   Abhi Verma, one of the persons who Mr. Montgomery blames for

24   what is characterized as the illicit taking of MOMT's operating entities,

25   adamantly disputes the representations made by MOMT in its September 14,

26   2018 press release, in Mr. Verma's own October 6, 2018 blog at

27

28

https://medium.com/@abhi_verna/the-true-story-behind-moneymobile.  In that

blog, Mr. Verma makes the following statements:

> In 2012, Mr. Montgomery, who represented himself as a
> payment expert and CEO of Calpian Inc. (now MOMT)
> approached the founders of MMPL and expressed his interest in
> collaborating with, what was then a fast-growing payments
> business. However, at the time, Calpian strangely chose not to
> invest in MMPL directly but instead insisted that a few select
> shareholders of MMPL create a new company as direct
> investment was "not permitted by Indian law and regulations."
> See e.g., https://www.sec.gov/Archives/edgar
> /data/1414628/000162828015002228/clpi49158-k.htm. Mr.
> Montgomery and some key MMPL shareholders then created a
> new company named Digital Payments Processing Limited
> ("DPPJ:') (See Annexure-2 for ownership of DPPL). Thereafter,
> MMPL agreed to a "Services Agreement" with DPPL, whereby
> certain key resources were transferred out of MMPL and MMPL
> was required to provide Services i.e., the operation of the Money
> on Mobile payment platform. It now appears this was done with
> duplicitous intentions so as to deprive the public shareholders of
> MMPL the value of the underlying payments business and to
> circumvent Indian banking and foreign investment regulations.
>
> Once DPPL was set-up, Calpian purported to agree over time to
> become a majority shareholder of DPPL and entered into a
> Memorandum of Understanding dated March 23, 2012 ("MoU")
> with MMPL and its shareholders. (See Annexure-3 for the MoU

dated March 23, 2012) The MoU also nominally entitled Calpian an option to merge DPPL into MMPL. However, any merger was subject to (i) the satisfaction of certain investment conditions, (ii) Indian banking and foreign exchange regulations permitting the investment, (iii) approval of public shareholders, and, most importantly, (iv) an appropriate valuation (see Clause 3.3 in the MoU). Hence, as a result of the MoU, Calpian held a limited option, with many conditions, which if met, then had to be voted on and passed to effectuate any merger.

Then, notwithstanding that direct investment was against Indian law, in August 2013, Mr. Montgomery then directed Calpian to deviate from the initial understanding in the MoU and to invest directly into MMPL (See Annexure-4 for the Amendment to the MoU). Once again, this understanding was subject to certain investment conditions which Calpian ultimately never met and has consistently breached and defaulted in complying with its obligations. As a result of this investment, for the first time, Calpian became a direct shareholder of MMPL and came to hold only 8% of its equity share capital.

The Deception Began. In January 2013, Mr. Montgomery began utilizing a PowerPoint slide show as part of his effort to meet with potential investors, brokers and small institutions to seek investment in Calpian.

https://www.sec.gov/Archives/edgar/data/

1414628/000119312513015940/d467622d8k.htm. At first, the deception was subtle. In his slideshow, Mr. Montgomery presented a "Company Overview" slide that listed Calpian and "Money on Mobile" as another company. He also misrepresented that Calpian "acquired stake in 2012 with options to purchase up to 74%." https://www.sec.gov/Archives/edgar/data/1414628/000119312513015940/ d467622dex991.htm.The fact is that neither Calpian nor DPPL had any stake in MMPL. The fact was that Calpian owned a small amount of DPPL, with the right to continue buying more shares of DPPL, and the only thing that existed between DPPL and MPPL was a limited Services Contract. Mr. Montgomery continued portraying "Money on Mobile" as a company, of which Calpian had a stake through July 24, 2014. See https://www.sec.gov/ Archives/edgar/data/1414628 /000135448813005155/clpi_ex991.htm; https://www.sec.gov /Archives/edgar/data/1414628/000135448814001072 /clpi_ex991.htm; https://www.sec.gov/ Archives/edgar /data/1414628/000156276214000174/clpi-20140723ex991ba8255.htm

5. Mr. Montgomery's Misrepresentation Escalates.

Thereafter, Mr. Montgomery began misleading Investors through its SEC filings and its press releases implying that it owned a "majority" of MMPL. For example, in Calpian's August 14, 2014 Press Release, it claimed it was "offering mobile payment services through Indian subsidiary Money-On-Mobile." https://www.sec.gov/ Archives/edgar /data/l 414628/000135448814004288/clpi_ex991.htm. See also https://www.sec.gov/ Archives/edgar/data/1414628…

32.     Perhaps most damning of MOMT's and Mr. Montgomery's representations was the resignation of MOMT's auditors based on fraudulent statements made to them:

> As part of the process for auditing the Company's financial statements for the year ended March 31, 2018, we determined that we have not been able to obtain appropriate, sufficient and competent evidential matter for us to complete our audit procedures, specifically in regards to transactions involving the group's transactions in India as well as obtaining representations from senior management of the Company's alleged majority controlled Indian subsidiaries. In performing our audit steps we identified a number of deficiencies including statements by senior accounting department staff in India that they had no record of certain material transactions that certain accounting entries were fictitious.
>
> On July 16, 2018, a senior member of the accounting and finance department staff at the Company's Indian subsidiary informed our engagement partner in the course of their conversation that the subsidiary had recognized and recorded fictitious revenues, understated liabilities and misappropriated assets in prior reporting periods….
>
> On July 21 2018, RBSM prepared and submitted a letter to the AC Chairman outlining the Firm's concerns with regard to potential fraud and illegal acts at the Company and in its Indian subsidiaries, in

particular Digital Payments Processing Limited ("DPPL") and SVR Retail Pvt., Ltd. ("SVR") between 2013 and 2017.

The Audit Committee (AC) … Chairman met with this 'whistleblower' individual, and this individual corroborated the account of events conveyed in our letter to the AC on July 21, 2018. These transactions took place in the Indian subsidiaries during 2013-2017.

The production of requested documents supporting management's assertion in the financial statements has been purposely delayed or not provided to us.

Responses to our Firm's inquiries of Company management as to the existence of fraud and confirmation of related party transactions have been consistently ignored and have purposely not been provided. https://www.sec.gov/ Archives/edgar/data/1414628 /000141462818000077 /rbsmletters.htm.

33.     As a direct result of the foregoing, MOMT's Auditor, Audit Committee, and entire Board of Directors, excluding only Mr. Montgomery, resigned.

34.     As a direct and proximate cause of the foregoing Misrepresentations and Omissions, upon which Mr. Lightfoot reasonably and actually relied in making the initial $700,000 in loans, converting such loans to Preferred Stock and converting such Preferred Stock into common stock, none of which he would have done but for such Misrepresentations and Omissions, Mr. Lightfoot lost the entirety of his $700,000 investment in MOMT.

# FIRST CLAIM FOR RELIEF

## *Elder Abuse*

### *Against Defendants Harold Montgomery and MoneyonMobile, Inc*

35.     Plaintiff realleges paragraphs 1 through 34, inclusive.

36.     Plaintiff is informed and believes, and based thereon alleges, that Defendants, Harold Montgomery and MoneyonMobile, Inc., and each of them, through the actions alleged above, took, secreted, appropriated, obtained and retain $700,000 of Plaintiff, an elder person, for a wrongful use or with intent to defraud Plaintiff, or both.

37.     Plaintiff is informed and believes, and based thereon alleges, that, through the actions above, Defendants, Harold Montgomery and MOMT, and each of them, assisted in taking, secreting, appropriating, obtaining, or retaining $700,000 of Plaintiff, an elder person, with intent to defraud him.

38.     Plaintiff is informed and believes, and based thereon alleges, that, by hiring Plaintiff's Investment Advisor as an employee of MOMT, and incentivizing him to do so, Defendants used undue influence over Plaintiff, through Ankit Sahu, to affect the taking, secreting, appropriating, obtaining and retaining, or assist in such taking, secreting, appropriating, obtaining or retaining, of Plaintiff's $700,000 investment.

39.     Plaintiff is informed and believes, and based thereon alleges, that Defendants, Harold Montgomery and MOMT, and each of them, knew or should have known that Defendants' wrongful acts were likely to be harmful to Plaintiff, an elderly person.

40.     As a direct and proximate consequence of Defendants' elder abuse, Plaintiff lost all of his $700,000 investment in MoneyonMobile, Inc., plus interest and attorneys' fees.

41.     Plaintiff seeks and is entitled to a judgment awarding the return of Plaintiff's principal, plus interest at 10% per annum, plus attorneys' fees and costs pursuant to California Welfare and Institution Code section 15657.5, and further seeks and is entitled to recover punitive and exemplary damages.

## SECOND CLAIM FOR RELIEF

*Securities Fraud – Section 10(b) and Rule 10B-5*

*Against all Defendants*

42.     Plaintiff realleges paragraphs 1 through 34, inclusive.

43.     Plaintiff alleges that Defendants, and each of them, made material Misrepresentations or Omissions alleged above, with scienter, knowing or with reckless disregard for the true facts, in connection with the purchase or sale of a securities by Plaintiff alleged above, that Plaintiff actually and reasonably relied on by purchasing and converting securities, as alleged above, without knowing the true facts, resulting in Plaintiff's loss of all of his $700,000 investment in MOMT directly and proximately caused when Plaintiff relied on such Misrepresentations and Omissions in deciding to make such investment.

44.     Plaintiff seeks and is entitled to recover his losses, according to proof at trial, plus interest and punitive and exemplary damages.

## THIRD CLAIM FOR RELIEF

*Liability under Section 12(2) of the Securities Act of 1933*

*Against MoneyonMobile, Inc. and Harold Montgomery*

45.     Plaintiff realleges paragraphs 1 through 34, inclusive.

46.     Plaintiff is informed and believes, and based thereon alleges, that MOMT and Harold Montgomery were the sellers to Plaintiff of the promissory notes, Preferred Stock and Common Stock referenced in this Complaint to Plaintiff.

47.     Plaintiff is informed and believes, and based thereon alleges, that such Defendants used interstate commerce or the mails to offer to sell or to sell such securities to Plaintiff, by means of a prospectus or oral communication; and that such communications included the Misrepresentations and Omissions alleged herein, of which Plaintiff did not have knowledge of the truth. Each such seller knew, or in the exercise of reasonable care would have known, that such statements were not true when made and of such omitted material facts necessary to make such statements not misleading.

48.     Wherefore, Plaintiff is entitled to recover his investment, plus interest, minus payments received thereon, if any, and such other relief as may be permitted at law or in equity, including, without limitation, rescission, as prescribed by 15 USC §77l, Section 12(2) of the Securities Act of 1933, with respect to each and all of the securities transactions alleged herein.

## FOURTH CLAIM FOR RELIEF

*Liability under Section 18(a) of the Securities Exchange Act of 1934*

*Against all Defendants*

49.     Plaintiff realleges paragraphs 1 through 34, inclusive.

50.     Plaintiff is informed and believes, and based thereon alleges, that Defendants, and each of them, made the false and misleading Misrepresentations and Omissions alleged herein, in the documents filed with the Securities and Exchange Commission alleged herein.

51.     Plaintiff actually relied on such statements in making the investment of $700,000 for promissory notes issued by MOMT, and by later converting those notes into MOMT Preferred Stock, and thereafter into MOMT common stock. Each of the Defendants knew, or in the exercise of reasonable care would have known, that such statements were not true when made and of such omitted material facts necessary to make such statements not misleading.

52.     Plaintiff is informed and believes that the market price of the securities purchased or acquired through conversion in MOMT was directly and dramatically impacted by the materially false Misrepresentations and Omissions alleged herein.  Had true and accurate statements been made by the Defendants in their public filings, the price for the promissory notes, Preferred Stock and common stock of MOMT would have been substantially lower, if not zero, at the time of the transactions stated above.

53.     Wherefore, Plaintiff is entitled to recover from each Defendant, jointly and severally, Plaintiff's investment, plus interest, minus payments received thereon, if any, and such other relief as may be permitted at law or in equity, including, without limitation, rescission.

## FIFTH CLAIM FOR RELIEF

*Liability under Section 20(a) of the Securities Exchange Act of 1934*

*Against All Defendants*

54.     Plaintiff realleges paragraphs 1 through 34, inclusive.

55.     Plaintiff is informed and believes, and on that basis alleges, that Defendants, and each of them, was, at all relevant time, a person who could exercise control over Ankit Sahu, acting both as MOMT's employee and Plaintiff's investment advisor, in connection with his sales to Plaintiff of MoneyonMobile, Inc. promissory notes, and later to convert such notes into Preferred Stock, and thereafter, to convert said Preferred Stock into Common Stock.

56.     Plaintiff is informed and believes, and on that basis alleges, that Defendants (excluding Harold Montgomery), and each of them, was, at all relevant times, a person who could exercise control over Harold Montgomery in connection with his sales to Plaintiff of MoneyonMobile, Inc. promissory notes,

1   and later to convert such notes into Preferred Stock, and thereafter, to convert

2   such Preferred Stock into Common Stock.

3         57.    Plaintiff alleges that, in making the misrepresentations and

4   omissions alleged herein to Plaintiff, Ankit Sahu and Harold Montgomery each

5   directly committed a primary violation by, among other things, making the

6   Misrepresentations and Omissions to Plaintiff to induce him to purchase the

7   promissory notes, and later to convert those notes into preferred stock, and

8   thereafter to common stock.  At all relevant times, Harold Montgomery, as CEO

9   of MOMT, controlled Ankit Sahu as an employee of MOMT.  Harold

10  Montgomery, in turn, was controlled by MOMT's Board of Directors,

11  Defendants herein.

12        58.    Each Defendant, in some meaningful sense, was a culpable

13  participant in the controlled persons' fraud.

14        59.    Wherefore, Plaintiff is entitled to recover from each Defendant,

15  jointly and severally, Plaintiff's investment, plus interest, minus payments

16  received thereon, if any, and such other relief as may be permitted at law or in

17  equity, including, without limitation, rescission.

18                        **SIXTH CLAIM FOR RELIEF**

19                             *Fraud and Deceit*

20                           *Against all Defendants*

21        60.    Plaintiff realleges paragraphs 1 through 34, inclusive.

22        61.    Plaintiff alleges that Defendants, and each of them, made material

23  Misrepresentations or Omissions alleged above, with scienter, knowing the true

24  facts, in connection with the purchase or sale of a securities to Plaintiff, as

25  alleged herein, that Plaintiff actually and reasonably relied on, without knowing

26  the true facts, directly and proximately causing Plaintiff's loss of all of his

27

28

---

$700,000 investment in MOMT when Plaintiff relied on such misrepresentations and omissions in deciding to make such investment and conversions.

62.     Plaintiff seeks and is entitled to recover his losses, according to proof at trial, plus interest and punitive and exemplary damages.

## SEVENTH CLAIM FOR RELIEF

*Negligent Misrepresentation*

*Against all Defendants*

63.     Plaintiff realleges paragraphs 1 through 34, inclusive.

64.     Plaintiff alleges that Defendants, and each of them, made material Misrepresentations or Omissions alleged above, with no reasonable ground for believing such representation to be true, in connection with the purchase or sale of securities sold to Plaintiff, alleged herein, that Plaintiff actually and reasonably relied on, without knowing the true facts, directly and proximately causing Plaintiff's loss of all of his $700,000 investment in MOMT when Plaintiff relied on such misrepresentations and omissions in deciding to make such investment.

65.     Plaintiff seeks and is entitled to recover his losses, according to proof at trial, plus interest and punitive and exemplary damages.

## EIGHTH CLAIM FOR RELIEF

*Breach of Fiduciary Duties*

*Against all Defendants*

66.     Plaintiff realleges paragraphs 1 through 34, inclusive.

67.     Plaintiff is informed and believes that, at all relevant times, Defendants, and each of them, owed fiduciary duties of care and loyalty to Plaintiff, as a debt holder of MOMT as an insolvent company, and later as a shareholder of MOMT.  Plaintiff is informed and believes that by hiring Ankit Sahu, Mr. Lightfoot's investment adviser, to raise capital, including from Mr.

Sahu's investment adviser client, Mr. Lightfoot, MOMT owed the same fiduciary duties to Mr. Lightfoot as were owed by Ankit Sahu as Mr. Lightfoot's investment adviser.

68.     Plaintiff is informed and believes that Defendants, and each of them, breached their fiduciary duties of care and loyalty to Plaintiff, by, among other things, publishing financial statements containing the Misrepresentations and Omissions set forth above, and by neglecting to correct such statements and/or protect their operating assets against the hijacking of such assets by their associates in India.

69.     Plaintiff is informed and believes that the Defendants, and each of them, knowingly participated in such breach of fiduciary duties.

70.     Such breaches of fiduciary duties directly and proximately caused Plaintiff to suffer the loss of his entire $700,000 investment in MOMT.

71.     Plaintiff prays for compensatory and punitive damages according to proof at trial.

## NINTH CLAIM FOR RELIEF

### *Breach of Contract*

### *Against MoneyonMobile, Inc.*

72.     Plaintiff realleges paragraphs 1 through 34, inclusive.

73.     MoneyonMobile, Inc. and Plaintiff entered into an oral contract on May 11, 2018, pursuant to which Plaintiff converted his $700,000 promissory notes into 140,000 shares of Preferred Stock in MOMT (at a conversion rate of $5) and later into 2,800,000 shares of common stock (at a conversion price of 25 cents per share of MOMT common stock) to be freely and immediately tradeable in the public market for such stock, plus monthly compensation pursuant to a consulting contract for which Plaintiff was to be paid a salary which would provide Plaintiff compensation of 12% per annum on Plaintiff's

investment, in exchange for no services by Plaintiff.  MoneyonMobile, Inc. promised, through Harold Montgomery, to promptly issue and deliver such common stock and to prepare such consulting agreement.

74.     Plaintiff performed all material parts of that agreement.

75.     MoneyonMobile, Inc. breached the agreement by failing and refusing to deliver the common stock promptly, or at all.  Moreover, in early June 2018, within a month after the oral agreement was formed, MoneyonMobile, Inc. became delinquent in its public filings and, to this day, remains delinquent.

76.     MoneyonMobile, Inc. had, at all relevant times, and to this day has, no registered shares that it could or that it can issue to Plaintiff.

77.     MoneyonMobile, Inc. could only comply with its promise on May 11, 2018 to deliver immediately to Plaintiff free trading common stock by delivering unregistered stock which could become free trading if MOMT delivered such stock and otherwise had been in full compliance with SEC Rule 144, which creates a safe harbor for public sales of unregistered securities. One requirement of Rule 144 is that the issuer maintains current financial statements on record with the SEC. MOMT delayed delivering such shares while MOMT had current financial statements with the SEC. As a result of MOMT's delay in delivering the common stock to Plaintiff, and thereafter failing to maintain current financial statements, MoneyonMobile breached its promises to Plaintiff to delivery free trading common stock promptly and, to this day, has not done so.

78.     As a direct and proximate result of MoneyonMobile, Inc.'s breach of its oral contract with Plaintiff, Plaintiff suffered damages in the amount to be proven at trial, which Plaintiff estimates would exceed $700,000 plus interest at 10 % per annum.

79.     Plaintiff is entitled to recover its losses from MoneyonMobile, Inc. resulting from its breach of the oral contract with MoneyonMobile, Inc.

Wherefore, Plaintiff, Max Lightfoot, demands judgment, as follows:

i)      on all Claims for Relief, awarding Plaintiff his lost investment, $700,000, plus interest at 10% per annum from the time that such investments were made by Mr. Lightfoot until the time paid by the Defendants; and

ii)     on the first claim for relief for Elder Abuse, for punitive damages, plus attorneys' fees and costs; and

iii)    on all claims based on elder abuse, intentional fraud and deceit, for punitive and exemplary damages according to proof of culpability at trial; and

iv)     on all claims for relief, granting such other and further relief as the Court deems just.

Dated:  November 20, 2018                    CORRIGAN & MORRIS, LLP

                                             By:  /S/ Brian T. Corrigan_____
                                             Brian T. Corrigan
                                             Attorneys for Plaintiff

---

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial.

Dated:  November 20, 2018                    CORRIGAN & MORRIS, LLP

By:  /S/ Brian T. Corrigan
Brian T. Corrigan
Attorneys for Plaintiff